UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TAMEKIA STATON,

        *Plaintiff*,

   v.

CHILDREN'S NATIONAL MEDICAL CENTER,

        *Defendant*.

No. 20-CV-03328 (DLF)

**MEMORANDUM OPINION**

    Tamekia Staton brings this action against her former employer, Children's National Medical Center, asserting that it discriminated against her based on her age, interfered with her right to take leave and retaliated against her for taking leave, subjected her to a hostile work environment, and wrongfully terminated her. Before the Court is the defendant's Motion for Summary Judgment. Dkt. 16. For the reasons that follow, the Court will grant the motion.

**I.    BACKGROUND**

    **A.    Factual History**

    Staton is an African American woman who worked for Children's National Medical Center from October 15, 2001, until her termination on April 24, 2020.[1] Compl. ¶ 6, Dkt. 1; Def.'s Statement of Undisputed Facts in Supp. of Def.'s Mot. for Summ. J. ¶¶ 1, 74, Dkt. 16-1. Starting in May 2006 and until her termination, she worked in various departments as a Coding Analyst. *Id.* ¶¶ 7, 69. To complete her Coding Analyst work, Staton used a medical billing software for

---

[1] The Court cites to the defendant's Statement of Facts if a fact is undisputed. If a fact is disputed, the Court will indicate as such.

outpatient services called Medaptus.  *Id.* ¶ 21.  From June 2014 onwards, both Staton and the only other Coding Analyst in her department, Ricki Barnes, worked exclusively on Medaptus.  *Id.* ¶ 28; Def.'s Mot., Ex. A-1 (Staton Dep.) at 42:9–19, 45:13–17, 92:6–12, Dkt. 16-4.

In August 2019, both Staton and Barnes were moved to a newly formed ACE (Auditing, Coding, Education) team.  Def.'s Statement of Facts ¶ 39.  Their new supervisor was Michele Jenkins, the Manager of Audits and Coding Projects.  *Id.* ¶ 35.  Jenkins reported to Dulcie Miller, the Director of the Revenue Integrity Department.  *Id.* ¶ 14.

Staton did not enjoy her experience on the ACE team.  Because she believed the ACE team was "created to audit coders," she felt that she "was about to be under probation or something because it was as if [she was] working with the enemy."  *Id.* ¶ 41.  Staton also alleges that Jenkins "made [her] remote workday unbearable," including by "monitoring [Staton's] computer screen on WebEx throughout [her] 8-hour shift," Pl.'s Resps. to Def.'s Statement of Undisputed Facts & Pl.'s Further Statement of Material Facts 16, ¶ 5, Dkt, 19-2, and by "subject[ing] [Staton] to insult[s] and slurs persistently," Compl. ¶ 60.  When asked to elaborate, Staton testified at a deposition that the only "inappropriate" thing Jenkins had done was to "roll[] her eyes" at Staton's answer to a question on a video call; Jenkins had never said anything, including any slurs, about Staton's race, age, or gender.  Staton Dep. at 189:3–19, 191:4–13, 193:13–21, 193:22–194:17; Def.'s Statement of Facts ¶¶ 76–77.

As early as 2018, Staton was informed that Children's National Medical Center would eventually retire Medaptus, the billing software she worked in, and transition to "a new auditing-based system called Cerner."  Def.'s Statement of Facts ¶ 31.  Staton did not know how to use Cerner to do coding, billing, or auditing work.  Staton Dep. at 82:19–22, 83:1–14.  On October 25, 2019, Michele Jenkins sent Staton an email asking if Staton was "interested in getting additional

2

credentials" that would be relevant to other areas of the ACE team, such as "denials, audits, education, [and] training." Def.'s Mot., Ex. J at 34, Dkt. 16-14. Jenkins noted that, because these additional areas fell within the scope of the ACE team's work, there would be no pay increase for taking on additional training and work. *Id.* at 33. Staton replied that, without a pay increase, she would "stick to [her] current coding job description." *Id.* As Staton herself stated, she wanted to communicate to Jenkins that she "ha[d] no interest in learning other aspects of the ACE team" and was "content with [her] analyst coding job." Staton Dep. at 136:10–15. Staton also forwarded the email exchange to Miller and reiterated that she would "like to stick to" being a Coding Analyst and was "not interested" in additional training if it was "not in [her] job description." Def.'s Statement of Facts ¶ 55.

On February 19, 2020, Miller informed the ACE team, including Staton, that Children's National Medical Center would officially stop using Medaptus "sometime" in June 2020 and switch to using Cerner. *Id.* ¶ 67. Around the same time, Miller learned from "IT leadership" that, because Cerner is an auditing-based software, the Coding Analyst positions held by Staton and Barnes would be eliminated. *Id.* ¶¶ 64, 66. In emails to each other, Staton's supervisors advocated terminating both Staton and Barnes because they "only work in Medaptus" and would no longer be needed after the "Cerner Revenue Cycle Go Live." Def.'s Mot., Ex. M at 2, Dkt. 16-17; Def.'s Mot., Ex. N, Dkt. 16-18. As the supervisors explained in the reduction in force worksheet, "[t]here [wa]s urgent need to reduce cost[,] and the work c[ould] be absorbed by existing team members until [the] new system [went] live." Def.'s Mot., Ex. N.

By March 2020, Staton and Barnes already had very little work to do in their Coding Analyst positions because their work had been reduced due to COVID and they had cleared the remaining Medaptus queues. Def.'s Mot., Ex. M at 3–4; Def.'s Mot., Ex. N at 2. With so little

3

work remaining before their termination, both women were put on mandatory Administrative Time Off (ATO) leave on April 13. Def.'s Mot., Ex. N at 7–8. On April 23, they were both informed via letter that their positions would be eliminated by a reduction of force effective April 24. Def.'s Statement of Facts ¶¶ 71, 74. Staton was forty-three years old when she was terminated, and Barnes was thirty-seven. *Id.* ¶¶ 72, 74–75.

### B. Procedural History

After her termination, Staton filed a complaint against Children's National Medical Center. Dkt. 1. Her complaint pleads six causes of action: (1) age discrimination under the DC Human Rights Act (DCHRA), Compl. ¶¶ 32–38; (2) age discrimination under the Age Discrimination in Employment Act (ADEA), *id.* ¶¶ 39–45; (3) interference under the Family and Medical Leave Act (FMLA), *id.* ¶¶ 46–50; (4) retaliation under the FMLA, *id.* ¶¶ 51–56; (5) hostile work environment under Title VII, *id.* ¶¶ 57–63; and (6) wrongful termination in violation of public policy, *id.* ¶¶ 64–69.

The defendant filed a motion for summary judgment on all counts. Dkt. 16.

## II. LEGAL STANDARD

Under Rule 56, summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247–48 (1986). A "material" fact is one that could affect the outcome of the lawsuit. *See Liberty Lobby*, 477 U.S. at 248; *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). A dispute is "genuine" if a reasonable jury could determine that the evidence warrants a verdict for the nonmoving party. *See Liberty Lobby*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895. In reviewing the record, the court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make

credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000).

A party "opposing summary judgment" must "substantiate [its allegations] with evidence" that "a reasonable jury could credit in support of each essential element of [its] claims." *Grimes v. District of Columbia*, 794 F.3d 83, 94 (D.C. Cir. 2015). The moving party is entitled to summary judgment if the opposing party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### III.   ANALYSIS

#### A.   Age Discrimination Under the DCHRA and ADEA

Staton claims that the defendant subjected her to age discrimination in violation of the DCHRA and ADEA by terminating her because she was above the age of forty. Compl. ¶¶ 32–45. Where, as here, a plaintiff offers only circumstantial evidence of discrimination, courts evaluate age discrimination claims using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1972). *Lane v. District of Columbia*, No. 17-01484, 2021 WL 3886304, at *5 (Aug. 31, 2021). Under that framework, the employee "must first make out a prima facie case" of discrimination. *Iyoha v. Architect of the Capitol*, 927 F.3d 561, 566 (D.C. Cir. 2019). The burden then shifts to the employer to "come forward with a legitimate reason for the challenged action." *Id.* If the employer does, the district court "need not—and should not—decide whether the plaintiff actually made out a prima facie case." *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (emphasis omitted). Four factors are "paramount in the analysis" of whether an employer has met its burden at step two: (1) the employer must produce evidence that would be admissible at trial for a finder of fact; (2) "the factfinder, if it believed the evidence, must reasonably be able to find that the employer's action was motivated by a

nondiscriminatory reason"; (3) the employer's justification must be "facially credible in light of the proffered evidence"; and (4) the employer must provide a "clear and reasonably specific explanation" for its action that is "articulated with some specificity." *Figueroa v. Pompeo*, 923 F.3d 1078, 1087–88 (D.C. Cir. 2019) (citations and internal quotation marks omitted).

The defendant's stated reason for terminating Staton was that "her position as a Coding Analyst would be eliminated" by the adoption of Cerner, and Staton did not have the technical or auditing skills needed to switch to a different role. Mem. of Law in Supp. of Def.'s Mot. for Summ. J. at 4, Dkt. 16-2; Def.'s Statement of Facts ¶¶ 64–67, 69–70. This reason is legitimate, non-discriminatory, and supported by admissible evidence. Internal emails discussing Staton's termination repeatedly stated that she would be terminated because Cerner would render her Coding Analyst role obsolete. Def.'s Mot., Ex. M at 2–4; Def.'s Mot., Ex. N; Pl.'s Opp'n, Ex. U, Dkt. 19-24. Further, Staton had expressed "no interest in learning other aspects of the ACE team" beyond her regular coding responsibilities. Staton Dep. at 136:10–15, 137:2–11; Def.'s Mot., Ex. J at 32–33. And because she had no familiarity with Cerner as a coding and auditing software, Staton could not transition to a different role.[2] Staton Dep. at 82:19–22, 83:1–14. Given that

---

[2] Staton disputes these factual characterizations about her knowledge of Cerner, *see* Pl.'s Statement of Facts 6, 8–9, but she identifies no evidence in the record that establishes a genuine issue of disputed fact. *See Ruiz v. U.S. Dep't of Just.*, 636 F. Supp. 2d 85, 88 (D.D.C. 2009) ("In opposing a summary judgment motion, [the] plaintiff may not [rely on] conclusory allegations . . . , but rather must set forth specific facts showing that there is a genuine issue for trial." (internal quotation marks and citation omitted)). Staton stated at her deposition that the defendant previously used Cerner for "medical records," but that she personally neither used nor was trained in using Cerner for coding, billing, or auditing. Staton Dep. at 82:19–22, 83:3–14. Thus, even her own deposition testimony does not contradict the defendant's statement that she did not know how to operate Cerner to carry out her job responsibilities.

Staton also asserts that she expressed no interest in learning Cerner or other auditing skills because she did not know that she might lose her job without such skills. Pl.'s Statement of Facts 19 ¶¶ 20–21. But the record shows that, as early as 2018, Staton was on notice that her employer would stop using Medaptus and switch to Cerner's auditing-based system. *Id.* ¶ 31.

Staton would have no work to do once the defendant switched to Cerner—and indeed had already run out of work before she was terminated, Pl.'s Opp'n, Ex. N at 7–8, Dkt. 19-17—the defendant's non-discriminatory reason to terminate Staton is facially credible and reasonably specific. The defendant has thus met its burden at step two.

Where a defendant has provided a legitimate reason for terminating an employee, the burden shifts to the employee to show that the reason was pretextual. At this stage, the Court "must conduct one central inquiry . . . : whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis." *Iyoha*, 927 F.3d at 566 (internal quotation marks omitted). "[T]he issue is not the correctness or desirability of the reasons offered but whether the employer honestly believes in the reasons it offers." *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (alterations and internal quotation marks omitted). To show pretext, a plaintiff can point to numerous sources of evidence of "illicit motive," including "the employer's better treatment of similarly situated employees outside the plaintiff's protected group, its inconsistent or dishonest explanations, its deviation from established procedures or criteria, or the employer's pattern of poor treatment of other employees in the same protected group as the plaintiff." *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015). In ADEA cases, the plaintiff must "show that a reasonable jury could find h[er] age was the 'but-for' cause of the employment action [s]he challenges." *Schuler v. PricewaterhouseCoopers, LLP*, 595 F.3d 370, 376 (D.C. Cir. 2010). In DCHRA cases, the plaintiff must "show a reasonable jury could find h[er] age had a determinative influence on the challenged employment action." *Id.* (internal quotation marks omitted).

Staton points to two categories of evidence to show pretext: (1) the "abusive working

environment [created by Jenkins] because of [Staton's] age," and (2) the hiring of a younger employee, Tariq Heatley, who was treated better than she was. Pl.'s Mem. in Supp. of Her Opp'n & Reply to Def.'s Mot. for Summ. J. (Pl.'s Opp'n) at 9–12, Dkt. 19-1. Neither reason persuades the Court that a reasonable jury could find Staton's age was a reason for her termination.

First, Staton has provided no evidence that Jenkins created an abusive work environment at all, much less because of Staton's age. Staton admitted that neither Jenkins nor any of the defendant's other employees ever made a joke about her age, mentioned her age, called her old, or called her derogatory names related to her age. Staton Dep. at 188:7–19. The only instance of "inappropriate" behavior that Staton could recount was that Jenkins "rolled her eyes" in response to something Staton said on a video call. *Id.* at 189:3–10.

Second, the defendant's hiring and treatment of Heatley is not persuasive evidence of pretext because Heatley was not similarly situated to Staton. An inference of discrimination can only be drawn "from disparate treatment of comparable employees [if] all of the relevant aspects of [the plaintiff's] employment situation are nearly identical to those of the comparator." *Bennett v. Solis*, 729 F. Supp. 2d 54, 61 (D.D.C. 2010) (alteration and internal quotation marks omitted). Heatley was hired into the ACE team to be a Senior Coding Auditor, a different position than Staton's. Pl.'s Opp'n, Ex. E, Dkt. 19-8; *see Bennett*, 729 F. Supp. 2d at 62 (finding comparator not similarly situated where comparator held a different position). A more appropriate "similarly situated" comparator would be Ricki Barnes, who was younger than Staton but held an identical position and worked in the same departments as Staton for many years. Staton Dep. at 42:9–19, 45:13–17, 92:6–12; Def.'s Statement of Facts ¶ 74. Barnes was terminated at the same time and for the same reasons as Staton. Def.'s Statement of Facts ¶ 74; Def.'s Mot., Ex. M at 2–4; Def.'s

Mot., Ex. N. This evidence weighs against any finding of pretext.

In sum, the defendant has presented a legitimate, non-discriminatory reason for terminating Staton—namely, that Staton's position would be eliminated with the adoption of a new software program and she lacked the technical or auditing skills needed to switch to a different role. Def.'s Statement of Facts ¶¶ 64–67, 69–70. Staton has failed to produce any evidence that would demonstrate to a reasonable jury that the defendant's reason for terminating her was not the actual reason for her termination. Nor has she shown that the defendant intentionally discriminated against her on the basis of age. Thus, the Court will grant the defendant's motion for summary judgment with respect to Staton's age discrimination claims.

**B.     Interference and Retaliation in Violation of FMLA**

Staton further alleges that the defendant interfered with her rights under the FMLA, Compl. ¶¶ 46–50, and retaliated against her for engaging in an activity protected under the FMLA, *id.* ¶¶ 51–56. The FMLA guarantees leave to covered employees for, among other reasons, "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). Employers may not "interfere with, restrain, or deny the exercise" of FMLA rights, *id.* § 2615(a)(1), or "discriminate against any individual for opposing any practice made unlawful" by the FMLA, *id.* § 2615(a)(2).

"To prevail on an FMLA interference claim, a plaintiff must show (1) employer conduct that reasonably tends to interfere with, restrain, or deny the exercise of FMLA rights, and (2) prejudice arising from the interference." *Waggel v. George Washington Univ.*, 957 F.3d 1364, 1376 (D.C. Cir. 2020). At the first step, the plaintiff need not show that any "interference" actually deprived her of FMLA leave, only that the employer action had a "reasonable tendency to interfere with, restrain, or deny the exercise of or attempt to exercise an FMLA right." *Gordon v. U.S. Capitol Police*, 778 F.3d 158, 165 (D.C. Cir. 2015) (internal quotation marks omitted). Staton

alleges that the defendant "told [her] not to take FMLA leave and . . . directly threatened" her. Compl. ¶ 49. But she has presented no evidence that would permit a reasonable jury to conclude either that the defendant's actions interfered with her exercise of her FMLA rights or that any of the defendant's actions prejudiced her.

Staton does not dispute that most of her requests for FMLA leave were granted and only two were denied. Pl.'s Statement of Facts at 13–15. For both denials, her leave requests were properly denied because she was ineligible. Her October 3, 2019, request was denied because the "FMLA does not provide leave for an employee to care for an adult sibling." Def.'s Statement of Facts ¶ 85. Her April 22, 2020, request was denied because it was not reported in a timely manner. Pl.'s Opp'n, Ex. O at 26, Dkt. 19-18. Indeed, Staton did not make her April 22 request until after her termination became effective on April 24. *See id.*; Def.'s Statement of Facts ¶ 71.

Staton presents threadbare evidence that the defendant interfered with her right to take leave: (1) warnings she received in October 2019 that she was abusing her sick leave, and (2) her placement on mandatory ATO leave in April 2020. Pl.'s Opp'n at 13–14. Neither salvages her FMLA interference claim.

In October 2019, Staton was confronted about her abuse of the Medical Center's sick leave policies because she was taking sick days in patterns of two-day increments each month. Pl.'s Opp'n, Ex. J at 4–5, Dkt. 19-13. The sick leave policies she had violated were completely separate from her right to FMLA leave. And, in this instance, the defendant actually *encouraged* Staton to exercise her FMLA rights by informing her that she could apply for FMLA leave instead of abusing her sick leave and "offer[ing] to send her . . . FMLA information." *Id.* at 6. After this conversation, Staton applied for FMLA leave for the first time. *Id.* at 9, 11.

10

As to Staton's placement on mandatory ATO leave in April 2020, she has produced no evidence that she was placed on ATO in an effort to prevent her from taking FMLA leave. The evidence shows that Staton was placed on ATO because she had "low to no volumes to work on during COVID" before her termination. Pl.'s Opp'n, Ex. N at 7. Because Staton has failed to present any evidence that the defendant interfered with her FMLA rights, the Court will grant the defendant's motion for summary judgment on this claim.

Staton's FMLA retaliation claim fails for similar reasons. "To establish a prima facie case of FMLA retaliation, a plaintiff must show (1) the exercise of protected FMLA activity; (2) an adverse employment decision; and (3) a causal connection between the protected activity and the adverse action." *Waggel*, 957 F.3d at 1375. An employer may rebut a prima facie case "by putting forward evidence of a legitimate, nonretaliatory reason for the adverse action." *Id.* Once it does, the plaintiff "must identify evidence of pretext in order to overcome the employer's rebuttal and survive summary judgment." *Id.* at 1375–76.

Staton alleges that the defendant retaliated against her requests for FMLA leave by moving her to Jenkins's ACE team, harassing her, placing her on ATO leave, and eventually terminating her. Compl. ¶ 55; Pl.'s Opp'n at 14–15. But she presents no persuasive evidence of harassment, nor does she present any other evidence that would permit a reasonable jury to find that the defendant took any of these actions because of her FMLA leave requests. First, Staton's move to the ACE team happened before she ever made her first request for FMLA leave. Def.'s Statement of Facts ¶¶ 39, 80. Second, she has not made a single allegation that Jenkins verbally or physically harassed her about her requests for FMLA leave. Third, she was placed on ATO leave because she had no work to do and was about to be terminated. Pl.'s Opp'n, Ex. N at 7. Finally, as explained above, Staton was ultimately terminated because the defendant was transitioning to a

new software system that would render her old role obsolete, and Staton lacked the training and experience to fill another role. The FMLA "does not protect an employee's job against a legitimate, unrelated[] reason for separation." *Thomas v. District of Columbia*, 227 F. Supp. 3d 88, 110 (D.D.C. 2016) (internal quotation marks omitted). The mere temporal proximity of Staton's termination to her final FMLA leave requests, on its own, is "not sufficiently strong to overcome the evidence the [defendant] presented in favor of [a] nondiscriminatory explanation for [her] termination." *Murphy v. District of Columbia*, No. 18-1478, 2022 WL 612710, at *13 (D.D.C. Mar. 2, 2022). The Court will therefore grant the defendant's motion for summary judgment with respect to Staton's FMLA retaliation claim, too.

C.  **Hostile Work Environment Under Title VII**

Staton also claims that she was subjected to a hostile work environment in violation of Title VII. Compl. ¶¶ 57–63. To support a hostile work environment claim, a plaintiff must establish that "(1) she is a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment occurred because of her [protected class]; and (4) the harassment affected a term, condition, or privilege of her employment." *Richardson v. Petasis*, 160 F. Supp. 3d 88, 123 (D.D.C. 2015). The alleged harassment must be "so severe or pervasive as to alter the conditions of the [plaintiff's] employment and create an abusive working environment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998) (citation and internal quotation marks omitted). The environment must be both "objectively and subjectively offensive." *Id*. at 787. "To determine whether an environment is objectively abusive, courts consider the totality of the circumstances, including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Richardson*, 160 F. Supp. 3d at 126 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). "[S]imple teasing, offhand comments, and isolated

12

incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher*, 524 U.S. at 788 (citation and internal quotation marks omitted).

To support her hostile work environment claim, Staton alleges that Jenkins "subjected her to insult[s] and slurs persistently," Compl. ¶ 60; monitored her work activity electronically through WebEx when she worked remotely, Pl.'s Opp'n at 15–16; reported inaccurate productivity levels, *id.* at 16; asked Staton to come in person to the office at times, *id.*; at a meeting, displayed "visibl[e]" irritation with Staton such as eye-rolling, *id.*; and changed Staton's work schedule, *id.* at 12. *See also* Pl.'s Statement of Facts at 16.

"[C]ourts have been hesitant to find a claim for hostile work environment when a complaint contains no allegations of discriminatory or retaliatory intimidation, ridicule, or insult in the plaintiff's day-to-day work environment and relies instead on incidents of allegedly discriminatory non-promotions and other performance-based actions." *Outlaw v. Johnson*, 49 F. Supp. 3d 88, 91 (D.D.C. 2014) (internal quotation marks omitted).  Here, Staton has identified no instances of abusive, threatening, or humiliating conduct.  When asked what "inappropriate gestures and slurs" Jenkins made, Staton stated that, one time, Jenkins "rolled her eyes" in response to Staton's answer to a question.  Staton Dep. at 189:3–10; 191:4–13.  Staton repeatedly confirmed that Jenkins never made any comments or slurs about Staton's age, race, or gender.  *Id.* at 189:11–19, 191:4–13, 193:22–194:17.  Jenkins's other "ordinary daily workplace decisions," *Bell v. Gonzales*, 398 F. Supp. 2d 78, 92 (D.D.C. 2005), such as monitoring Staton's work through WebEx in order to "have more visibility to any problems . . . [in the] workflow," Pl.'s Opp'n, Ex. J at 4, "are not sufficient to establish a hostile work environment," *Bell*, 398 F. Supp. 2d at 92.  *See also Graham v. Holder*, 657 F. Supp. 2d 210, 217 (D.D.C. 2009) ("Being subjected to 'scrupulous monitoring' does not

13

support a claim for hostile work environment . . . ."). Therefore, the Court will grant the defendant's motion for summary judgment with respect to Staton's hostile work environment claim.

### D. Wrongful Termination in Violation of Public Policy

Finally, Staton alleges that the defendant wrongfully terminated her in violation of public policy because the defendant terminated her due to her age in violation of the DCHRA. Compl. ¶¶ 65–68; Pl.'s Opp'n at 19. It is well-established that "in the District of Columbia . . . an employer may discharge an at-will employee at any time and for any reason, or for no reason at all." *Adams v. George W. Cochran & Co.*, 597 A.2d 28, 30 (D.C. 1991). "District of Columbia courts, however, recognize a very narrow public-policy exception for cases in which the employee's termination offends some mandate of public policy . . . ." *Coles v. Harris Teeter, LLC*, 217 F. Supp. 3d 185, 188 (D.D.C. 2016) (internal quotation marks omitted). But a plaintiff cannot avail herself of this narrow public-policy exception and state a wrongful termination claim "where the very statute creating the relied-upon public policy already contains a specific and significant remedy for the party aggrieved by its violation." *Kassem v. Wash. Hosp. Ctr.*, 513 F.3d 251, 254 (D.C. Cir. 2008) (quoting *Nolting v. Nat'l Cap. Grp., Inc.*, 621 A.2d 1387, 1390 (D.C. 1993)).

Staton bases her wrongful termination claim solely on the defendant's alleged violation of the DCHRA. Compl. ¶¶68–69; Pl.'s Opp'n at 19. Because the DCHRA already contains its own remedial scheme, however, her claim necessarily "falls outside the purview of the limited public policy exception permitting wrongful termination claims by at-will employees." *Johnson v. Joseph J. Magnolia, Inc.*, No. 21-cv-772, 2021 WL 5331708, at *3 (D.D.C. Nov. 16, 2021); *see also McManus v. MCI Commc'ns Corp.*, 748 A.2d 949, 957 (D.C. 2000). The Court will therefore grant summary judgment in favor of the defendant on Staton's wrongful termination claim.

## CONCLUSION

For the foregoing reasons, the Court grants the defendant's motion for summary judgment.

A separate order consistent with this decision accompanies this memorandum opinion.

_____
DABNEY L. FRIEDRICH
United States District Judge

Date: September 23, 2022